## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | | |
| **Plaintiff,** | | **8:13CR88** |
| **vs.** | | |
| **JUAN AVALOS,** | | **FINDINGS AND RECOMMENDATION** |
| **Defendant.** | | |

This matter is before the court on the motion to suppress (Filing No. 17) filed by defendant Juan Avalos (Avalos).  Avalos is charged along with Jose Avalos in the Indictment with possessing methamphetamine with intent to distribute (Count I) in violation of 21 U.S.C. § 841(a)(1).  Avalos is charged alone in Count II with the possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g).  Jose Avalos is charged alone in Count III with possessing a stolen firearm in violation of 18 U.S.C. § 922(j)(1).  Avalos seeks to suppress any evidence seized by the Omaha Metro Area Fugitive Task Force (Task Force) from 2114 South 45th Street, #114, Omaha, Nebraska, on February 1, 2013.  Avalos filed a brief (Filing No. 16) in support of his motion.

The court held an evidentiary hearing on the motion on May 28, 2013.  Avalos was present with his counsel, Stuart J. Dornan and Ross R. Pesek.  The United States was represented by Assistant U.S. Attorney Robert C. Sigler.  The court heard the testimony of Task Force Officers Jeffery Shada (Officer Shada) of the Omaha Police Department and Travis Jarzynka (Officer Jarzynka) of the Council Bluffs Police Department.  A transcript (TR.) of the hearing was prepared and filed on May 28, 2013, at which time the motion was deemed submitted.  **See** Filing No. 26.

### FINDINGS OF FACT

On February 1, 2013, Officers Shada and Jarzynka were involved in a Task Force operation directed at securing Avalos' arrest (TR. 9, 40).  The officers had a Pottawattamie County, Iowa, warrant for Avalos' arrest listing escape as reason for the warrant (TR. 9).  Officer Jarzynka received information from a probation officer from the

Council Bluffs, Iowa, office that Avalos was living in an apartment at 2114 South 45th Street, #114, Omaha, Nebraska (TR. 9-10).   The apartment belonged to Avalos' brother, Jose Avalos (TR. 10).   The probation officer also told Officer Jarzynka that Avalos was armed with a handgun and if given the chance he would flee (TR. 10).

On February 1, 2013, while Officer Jarzynka conducted surveillance on the apartment, he observed a man matching Avalos' description leave the apartment and notified other Task Force members by radio (TR. 10-11).   Officer Jarzynka and Officer Friend conducted a traffic stop at approximately 60th and Grover streets just south of the apartment (TR. 11).   The person was later identified as Avalos' brother, Jose Avalos (TR. 11).   Jose Avalos confirmed for the officers Avalos was living in Jose Avalos' apartment and gave them a key to gain access (TR. 11-12).   Jose Avalos did not place any restrictions on the officers' entry into the apartment (TR. 12).   The officers returned to the apartment with Jose Avalos but kept him with Officer Friend parked two blocks up the street near 45th and Center streets (TR. 12).

Jose Avalos' apartment building is a freestanding, multi-unit apartment complex (TR. 11).   The building is two or three stories high with a secured entrance (TR. 11-12). Access to the individual apartments is obtained through an interior hallway (TR. 12). Jose Avalos' apartment is on the east side of the hallway on the first floor, approximately twenty-five feet from the security door (TR. 23-24).   There is an apartment directly across the hall from Avalos' apartment and more apartments farther down the hallway (TR. 23).   The officers made sure there were no other people in the hallway to the north and south of the apartment before Officers Shada and Jarzynka and at least three other officers approached the front door of the apartment (TR. 13, 24).   There were at least two officers outside covering the sliding glass door on the east side of the apartment building and another two officers covering the windows on the north side of the apartment building in order to prevent Avalos from fleeing (TR. 26).

The officers knocked on the apartment door and loudly announced themselves as officers with a warrant for Avalos' arrest but the officers did not receive a response (TR. 13).   The officers used Jose Avalos' key to unlock and open the door to the apartment (TR. 14).   As the officers stood at the door, the officers could see a ten by ten foot kitchen to the immediate left and a ten by twenty foot living room a little farther

down to the left (TR. 14).  Approximately twenty feet into the apartment on the right, the officers saw a hallway, which the officers later discovered led to two bedrooms and a bathroom (TR. 14).  There were no individuals immediately visible in the apartment (TR. 14).  The officers announced themselves again as officers with a warrant and Avalos responded by coming out of the hallway from the right (TR. 14).  In lieu of entering the apartment, the officers directed Avalos to step backward toward the officers into the hallway with his hands up (TR. 15).  The officers remained in the hallway to keep cover for their safety (TR. 15).   The officers subsequently handcuffed Avalos outside the doorway to the apartment (TR. 15).   Officer Jarzynka informed Avalos he was being arrested based on the arrest warrant from Pottawattamie County, Iowa (TR. 16).

The officers asked Avalos if there were any other people present in the apartment to which he responded there were not (TR. 15).  When the officers made the arrest Avalos wore a light weight t-shirt, blue jeans, and socks with no shoes (TR. 15).  The weather outside was approximately five degrees with a wind chill below zero (TR. 21).  The high wind was apparent from the wind tunnel effect created in the hallway when the security door was open (TR. 22).   The officers asked Avalos where they could get him clothing and shoes due to the cold and windy weather (TR. 15).   The officers made this request prior to entering the apartment (TR. 15, 42, 45, 47).  Avalos informed the officers his room was down the hallway to the right and was the first room on the left, the smaller bedroom (TR. 16).   The officers formed a team and entered the apartment (TR. 16).  Upon entry the officers went through the apartment clearing each room to make sure there were no other people in the apartment (TR. 16).

Officers Shada and Jarzynka entered Avalos' bedroom to retrieve items of clothing (TR. 17, 41).  From the doorway to the room, the officers could see a mattress with no bedframe on the floor, a black shelving unit against the east wall, and clothing, including shoes and a coat on the floor (TR. 17).   Also in plain view, the officers observed a chrome handgun on the floor and a small plastic bag containing suspected methamphetamine on the shelving unit (TR. 17, 19, 41).   Officer Shada observed that the handgun was a semi-automatic handgun with no magazine inside and the suspected methamphetamine was in a solid rectangular chunk inside the bag (TR. 19).  Due to the large amount of clothing the officers observed in the bedroom, they returned

3

to the hallway and asked Avalos for a more specific description of the desired clothing (TR. 45).  The officers received further description of the clothing desired by Avalos and were able to retrieve the exact clothing (TR. 18, 42, 45).  Avalos also requested the officers retrieve his wallet from the bathroom (TR. 36).  After Avalos received his wallet and clothing and dressed, Officer Jarzynka transported Avalos to Douglas County Corrections (DCC) for booking (TR. 18).  The officers also took the gun and suspected narcotics to book into evidence at DCC (TR. 18, 42).  At DCC Officer Friend interviewed Avalos in the presence of Officer Shada (TR. 18).

At DCC Officer Shada contacted the narcotics unit to identify the substance in the plastic bag (TR. 20).  The narcotics unit detective, Officer Anderson, met Officer Shada at Omaha Police headquarters where they conducted a field test on the substance, confirming it was seven grams of methamphetamine (TR. 19-20).  Officer Shada gave specific details of the layout and contents of the apartment to the narcotics unit in order to assist the narcotics unit in writing a warrant to search the apartment (TR. 20).  Following the issuance of a search warrant the narcotics unit searched Jose Avalos' apartment and seized items of suspected narcotics and narcotics trafficking (TR. 21).

## LEGAL ANALYSIS

Avalos seeks to suppress any and all evidence seized on February 1, 2013, at the apartment.  **See** Filing No. 17 – Motion.  Avalos contends the Task Force officers conducted an unconstitutional protective sweep of the apartment without a search warrant.  **Id.**  Avalos contends the fruits of the search should be suppressed based on the alleged unconstitutional protective sweep.  **Id.**

The Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable."  ***Kentucky v. King***, 131 S. Ct. 1849, 1856 (2011) (internal quotations omitted).  "The warrant requirement is subject to certain reasonable exceptions."  **Id.** One well-recognized exception applies when "'the exigencies of the situation' make the

needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." ***Id.*** (**quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)**).   Ordinarily when a person is arrested outside of the residence a warrantless search of the residence is not justified.  **See *United States v. DeBuse*, 289 F.3d 1072, 1074 (8th Cir. 2002)**.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  ***Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)**.   "[A]n officer is authorized to take reasonable steps to address the safety of the arrestee and that the arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant." ***United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000)** (**cited by *DeBuse*, 289 F.3d at 1074**).   A court examines several factors when applying the clothing exception to the warrant requirement, including:  1) whether an officer has an objective need to protect an arrestee from a significant risk of injury, 2) whether an intrusion was "slight and temporary" and 3) whether an officer's entry to retrieve clothing was pretextual or to retrieve an arrestee's clothing to ensure the arrestee's safety while in custody.  ***Id.*** at 333-34.

Officers entering a residence are entitled to conduct a protective sweep of the premises to protect the safety of the officers.  ***United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009)**.   "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  ***United States v. Anderson*, 688 F.3d 339, 346 (8th Cir. 2012)** (**quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)**).   "[T]he Supreme Court held a protective sweep does not violate the Fourth Amendment if the searching officer possessed a reasonable belief based on specific and articulable facts which . . . reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others."  ***Id.*** at 346 (internal quotations omitted).

When conducting a protective sweep officers may seize incriminating items found in plain view. "Police may seize, without a warrant, an item that is 1) in plain view 2) when it is observed from a lawful vantage point, 3) where the incriminating character of the item is immediately apparent." *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008) (internal footnote omitted). "Probable cause is required to justify the seizure of an item that police observe in plain view." *Id*. If entry is required to fulfill the officer's duty to protect the arrestee and officers find incriminating evidence in plain view while in the residence, seizure of the evidence is permitted. *Gwinn*, 219 F.3d at 333-35.

Avalos argues the protective sweep was unconstitutional because the officers entered the apartment without a warrant and the officers had no specific facts to justify a warrantless search (TR. 48-49). Avalos argues the officers had no reason to believe there were any other people in the apartment because they already had Avalos in custody in the hallway and Jose Avalos in custody outside, therefore the threat of an attack by a third person was minimal (TR. 49). Avalos argues because the officers were secure in the hallway and faced no threat of danger, they had no reason to put themselves in danger to conduct a protective sweep of the apartment (TR. 48). Avalos contends "the protective sweep was an unconstitutional search and the fruits of said search should be suppressed." **See** Filing No. 16 – Brief p. 6.

Prior to entering the apartment Officers Shada and Jarzynka asked Avalos where they could find his clothes. Avalos was wearing a light weight t-shirt, blue jeans, and socks on a cold and windy day. The officers, being responsible for Avalos' safety, had a duty to make sure Avalos was appropriately clothed before taking him outside in the inclement weather. The officers were constitutionally permitted to enter the apartment with the intention of finding clothing for Avalos. At the time the officers entered to obtain the clothing, no officers had yet entered the apartment. The officers were not required to believe Avalos' statement that there were no other people in the apartment. For their safety the officers reasonably conducted a protective sweep to ensure there were no other people in the apartment. Upon entry to the bedroom to obtain the clothing Officers Shada and Jarzynka were able to see a gun and a plastic bag containing suspected methamphetamine. The officers saw the items in plain view, from a lawful vantage point, and the incriminating character of the gun and suspected narcotics were

6

immediately apparent.  These items were constitutionally seized.  The officers acted in compliance with the Constitution and the evidence found on February 1, 2013, should not be suppressed.

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that**:

Juan Avalos' motion to suppress (Filing No. 17) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation.  Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 26th day of June, 2013.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

7